FILED

February 17, 2017

TN COURT OF
WORKERS'
COMPENSATION
CLAIMS

Time 3:00 PM



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT MEMPHIS

| | | |
|---|---|---|
| BYRON ADAMS, | ) | Docket No. 2016-08-1001 |
| Employee, | ) | |
| v. | ) | |
| SAVAGE CONSTRUCTION CO., | ) | State File No. 60091-2016 |
| Employer, | ) | |
| And | ) | |
| BUILDERS MUTUAL INS. CO., | ) | Judge Allen Phillips |
| Insurance Carrier. | ) | |

---

## EXPEDITED HEARING ORDER FOR MEDICAL AND TEMPORARY DISABILITY BENEFITS

---

This matter came before the undersigned Workers' Compensation Judge on January 24, 2017, upon the Request for Expedited Hearing filed by Byron Adams. Mr. Adams requested medical and temporary disability benefits for an injury to his right foot on August 3, 2016. Savage Construction contended the injury neither arose out of his employment nor aggravated any preexisting condition. Accordingly, the central legal issue is whether Mr. Adams came forward with sufficient evidence to show either an injury or a compensable aggravation of a preexisting condition. The Court holds Mr. Adams came forward with the sufficient evidence and holds he is entitled to the requested benefits.

### History of Claim

Mr. Adams worked for Savage as a construction project manager. In his role, he suffered two separate incidents that form the basis of this claim.

On May 9, 2014, a piece of plywood struck his right foot. After reporting this injury to David Savage, the owner of the company, Mr. Adams recalled Mr. Savage advising him that he might seek medical care if needed. Mr. Savage did not recommend a

1

specific physician. However, Mr. Adams opted to return to Campbell Clinic, where he was already treating for other issues. Mr. Savage did not object. At that time, Mr. Adams understood Mr. Savage would personally pay for any charges at Campbell Clinic, but does not know to this day if he did so. Likewise, he does not know if Savage Construction ever reported the injury to its workers' compensation carrier.

Several days thereafter, Mr. Adams saw a physician at Campbell Clinic and described how the plywood incident was causing "pain . . . on the dorsum of his midfoot." (Ex. 2 at 42.) X-rays revealed no obvious fractures or dislocations, but there was evidence of mild degenerative changes. The physician diagnosed a right foot contusion and recommended Mr. Adams wear "a boot." *Id.* Mr. Adams told the physician he wanted to follow-up with Dr. Phillips at the clinic, since he was already seeing Dr. Phillips for unrelated knee issues.

Mr. Adams saw Dr. Phillips in June 2014 and reported "mild to no tenderness" of his foot. *Id.* at 44. He was able to walk normally. Dr. Phillips noted the x-rays showed "midfoot arthritis" and diagnosed, as pertinent here, "degenerative joint disease of the foot." *Id.* There are no further medical records addressing the right foot injury of May 2014.

The second incident occurred on August 3, 2016, when Mr. Adams' right foot "popped" when he was moving material at a job site. The pain intensified overnight, and he reported the injury to Mr. Savage the next morning. As in 2014, Mr. Savage acquiesced to Mr. Adams returning to Campbell Clinic.

When he saw a physician's assistant (PA) at the clinic, Mr. Adams reported "carrying an object that was about 65 pounds at work" and, when taking a step, "felt as though his foot 'fell flat'." (Ex. 2 at 3.) He reported his pain increased overnight and that he had difficulty walking. He admitted that over the years he had "chronic mild foot pain and swelling into both of his feet," but primarily the right foot and mentioned the 2014 plywood incident. *Id.* The PA assessed his condition as "right foot pain; suspicion includes occult fracture" and prescribed an orthotic and pain medications.

When he returned two weeks later, Mr. Adams noted increased pain and swelling. The PA referred him to "one of my foot and ankle specialists to ensure that I am not missing any diagnoses." *Id.* at 6. Mr. Adams then came under the care of Dr. Ben Grear who, according to forms completed by Mr. Adams, is part of Campbell Clinic's "Foot and Ankle Center." *Id.* at 8.

On August 17, 2016, Dr. Grear recorded Mr. Adams' history and noted he had "similar pain once before many years ago when he dropped something on his foot." *Id.* at 9. Mr. Adams noted both feet swell, with the right greater than the left, but the right foot

2

is now "acutely more swollen and more painful." *Id.* Dr. Grear suspected a possible Lisfranc injury and recommended an MRI. The MRI of August 22, 2016, was interpreted by the radiologist as showing "evidence of a chronic Lisfranc injury with marked osteoarthrosis of the Lisfranc joint. A superimposed acute injury would be difficult to exclude given the marked degenerative changes, but no definite acute injury is identified." (Ex. 2 at 13.) Dr. Grear interpreted the MRI as "demonstrat[ing] acute edema and likely an acute Lisfranc injury . . . but also fairly severe arthrosis [of multiple joints of the foot]." *Id.* at 15.

Dr. Grear recommended surgery to fuse the affected joints of the right foot. He felt continued conservative treatment options would not "relieve [Mr. Adams'] foot pain in the long-term" given his "acute injury with the history of arthrosis." *Id.* at 15. Dr. Grear stated, "Of note, [Mr. Adams] does report he had some pain prior to this injury in his midfoot, but [it] has significantly worsened since the new injury." *Id.*

On September 20, 2016, Dr. Grear provided the following causation opinion:

> While at work, Mr. Adams sustained an injury on 08/03/2016. I think more likely than not his work injury is causing his current pain symptoms and injury (i.e. the injury sustained at work is more than 51% responsible for his current symptoms). He does have some previous midfoot arthritis, but his MRI demonstrates new acute bone marrow edema consistent with a new injury.
>
> I think this new injury is causing increased instability into the Lisfranc complex, making his midfoot arthritis much more symptomatic and debilitating.

*Id.* at 20.

Regarding this treatment in 2016, Mr. Adams testified Builders Mutual paid both the bills of Campbell Clinic and the MRI provider.

After receiving the causation opinion from Dr. Grear, Builders Mutual presented Mr. Adams a panel of physicians, and he chose Dr. John Lochemes, who evaluated him on November 1, 2016. (Ex. 1 at 6.) After examining Mr. Adams and reviewing records, including the MRI, Dr. Lochemes determined that the August 3 injury caused less than 50% of Mr. Adams' current foot condition. (Ex. 1 at 16.) He based his opinion upon Mr. Adams' history in context of his reading of the MRI as showing bone marrow edema of a chronic, rather than an acute, nature. *Id.* at 10. He explained that "it is impossible for the MRI to have the appearance it does at the present time without pre-existing significant deformity and injury present." (Ex. 1, Ex. 2 at 2.) Regarding Mr. Adams

3

recollection of only minimal symptoms between 2014 and 2016, Dr. Lochemes stated he "[did not] believe [Mr. Adams'] recollection of his foot condition prior to [August 3, 2016] is accurate." *Id.* Instead, he submitted Mr. Adams' continued right foot issues were more consistent with the 2014 plywood incident or some other event prior to August 2016. (Ex. 1 at 14.) He surmised that because Mr. Adams "live[d] a vigorous life," there were "obviously other opportunities for injury." *Id.* at 14. He also found no evidence of an aggravation of a preexisting condition, including the 2014 issues that caused an anatomic advancement. (Ex. 1 at 31.)

Mr. Adams testified he sought no medical treatment for his right foot between 2014 and the August 3, 2016 incident. He did have pain and swelling, but was able to function during those years without limitations. For example, he refereed basketball during two seasons between 2014 and 2016 but quit for reasons other than his foot. Because of the August 2016 injury, Mr. Adams was unable to resume his duties as a project manager, but he instead works for Savage as an estimator for significantly lower pay.

Based upon this evidence, Mr. Adams argued he sustained a compensable injury on August 3, 2016. He urged the Court to focus upon the change in severity of his condition after August 3. Pointing to *Trosper v. Armstrong Wood Products*, 273 S.W2d 598 (Tenn. 2008), he argued the evidence requires a finding that an increase in severity of his symptoms constitutes a compensable injury.

Savage contended Dr. Lochemes' opinion is entitled to a presumption of correctness under Tennessee Code Annotated section 50-6-102(14)(E) (2016). When viewing it with such presumption, it argued Dr. Grear's opinion stating in a medical record only does not rebut such presumption. It further argued *Trosper* does not control post-July 1, 2014 injuries.

## Findings of Fact and Conclusions of Law

### *Standard applied*

Because this case is in a posture of an Expedited Hearing, Mr. Adams need not prove every element of his claim by a preponderance of the evidence. Instead, he must come forward with sufficient evidence from which the court can determine he is likely to prevail at a hearing on the merits. Tenn. Code Ann. § 50-6-239(d)(1) (2016); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-*9 (Mar. 27, 2015). This lesser evidentiary standard does not relieve him of the burden of producing evidence of an injury by accident that arose primarily out of and in the course and scope of employment, but allows some relief to be granted if his evidence does not rise to the level of a "preponderance of the evidence." *Buchanan v. Carlex Glass Co.*,

4

2015 TN Wrk. Comp. App. Bd. LEXIS 39, at *6 (Sept. 29, 2015).

## *Analysis*

### *Applicable authority*

The Workers Compensation Law requires employers to provide injured employees with reasonable and necessary medical care related to a work injury. A work-related injury causes a need for medical treatment if, within a reasonable degree of medical certainty, it contributed more than 50% to the need for treatment. To meet the "reasonable degree of medical certainty" standard requires a physician's opinion that it is more likely than not, considering all possible causes, as opposed to speculation. *See* Tenn. Code Ann. §§ 50-6-204(a)(1)(A), 50-6-102(14)(C), and 50-6-102(14)(D) (2016).

### *Mr. Adams' established an incident identifiable by time and place of occurrence*

Mr. Adams testified he felt a "pop" in his right foot while working at a job site. Though Savage challenged Mr. Adams' description of the specifics of the event, it offered no countervailing evidence. Thus, the Court holds Mr. Adams is likely to prevail at a hearing on the merits regarding the first element of a compensable injury, the occurrence of an incident.

### *Mr. Adams came forward with sufficient evidence that his injury contributed more than 50% to his need for medical treatment*

In this case, the medical evidence, in the context of Mr. Adams' lay testimony, is dispositive. First, the Court finds Mr. Adams credible. His testimony was steady, forthcoming, reasonable and honest when he described the onset of symptoms after the incident of August 3. *See Kelly v. Kelly*, 445 S.W.3d 685, 694-695 (Tenn. 2014)(explaining the indicia of reliable testimony). The same is true regarding his testimony regarding his condition between 2014 and 2016; the Court believes him when he says he was functioning well both at work and away from work in the period between the two incidents. The Court particularly accredits his testimony that he worked full duty in a labor-intensive job and participated in vigorous avocational activities such as refereeing basketball. These facts are important because the Court must consider the medical evidence in conjunction with Mr. Adams' testimony as to how the injury occurred and his subsequent condition. *See Nance v. Randstad*, 2015 TN Wrk. Comp. App. Bd. LEXIS 15, at *9 (May 27, 2015).

This importance of this conjunction is emphasized by considering Mr. Adams' testimony in context of Dr. Lochemes' assertion that an "accurate history of the mechanism of injury" is "very important." Dr. Lochemes noted his objective findings did

5

not match Mr. Adams' history of the onset of problems after the August 3 incident. He surmised that because Mr. Adams "live[d] a vigorous life," there were "obviously other opportunities for injury." *Id.* at 14. The Court agrees; there were over two years of construction work and "vigorous living" between the incident of 2014 and the incident of 2016 that *could* have prompted a foot injury. However, there is only Mr. Adams' uncontroverted version of what actually *did* prompt his need for medical treatment, namely the effects of the August 3 incident. Having accepted Mr. Adams' version, the Court turns to the specific medical evidence.

In so doing, the Court must choose to accredit the expert opinion of either Dr. Lochemes or of Dr. Grear. *See Brees v. Escape Day Spa & Salon*, 2015 TN Wrk. Comp. App. Bd. LEXIS 5, at *14 (Mar. 12, 2015). When making its choice, the Court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Id.*

Applying these criteria to Dr. Lochemes, the Court finds he is qualified to treat the anatomic condition at issue. He testified to his many years of experience in treating foot problems, including work at a well-known orthopedic clinic "as their foot and ankle specialist." (Ex. 1 at 5.) However, he admitted he was not specifically trained as such. Further, he had Dr. Grear's records at the time of his evaluation, had the opportunity to question and examine Mr. Adams, and had the opportunity to review the MRI.

However, the Court notes Dr. Lochemes saw Mr. Adams on only one occasion after he was chosen from a panel offered by the carrier, at a time *after* Dr. Grear had recommended surgery. Moreover, and importantly, he disagreed with Dr. Grear's interpretation of the MRI and, to a lesser but still important degree, the radiologist who first interpreted the MRI.

When applying the same criteria to Dr. Grear, the Court gleans, from both the PA's referral and a completed form at the "Foot and Ankle Center," that Dr. Grear is a foot and ankle specialist. (Ex. 2 at 6, 8.) Using that expertise, he attributed "more than 51%" of Mr. Adams' need for medical treatment to the work injury and specifically found MRI evidence of "acute bone marrow edema consistent with a new injury." This caused increased anatomic instability and debilitating pain. *Id.* at 20. As a foot specialist, he is in a superior position to read and interpret the MRI. Also, when considering the importance of such information to other experts, the Court notes an independent radiologist stated "a superimposed acute injury would be difficult to exclude given the marked degenerative changes." (Ex. 2 at 13.)

Further, the circumstances of Dr. Grear's examination are important. He, and the physician's assistant before him, saw Mr. Adams for purposes of treatment. "It seems

6

reasonable that the physicians having greater contact with the [employee] would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 677 (Tenn. 1991).

Most importantly, Dr. Grear explained that surgery was indicated because 1) conservative treatments had failed, and 2) despite "the fact that he had pain prior to [August 3]," he now required stabilization after the most recent event. (Ex 2 at 15.) He further explained the MRI revealed objective evidence of a new injury that "is causing increased instability" and making Mr. Adams' symptoms more debilitating. *Id.* at 20. These statements indicate Dr. Grear considered "all causes" for Mr. Adams' need for medical treatment. *See* Tenn. Code Ann. § 50-6-102(14)(C) (2016). It also fits squarely with Mr. Adams' testimony that his symptoms significantly worsened after August 3, 2016.

Moreover, Mr. Adams first consulted Dr. Grear's clinic because Savage consented for him to go there after both the 2014 and 2016 injuries. Hence, though the Court finds it inappropriate for the carrier to ask the Court to apply a presumption of correctness to Dr. Lochemes' opinion, the Court might as easily find Dr. Grear is an authorized physician given Savage's tacit approval of Campbell Clinic. However, regardless of any presumptive correctness, the Court specifically finds the preponderance of the evidence supports Dr. Grear's opinions.

The same holds true if the event of August 2016 is considered an aggravation of a preexisting condition. "The pertinent statute makes clear that an aggravation of a pre-existing condition is a compensable injury when 'it can be shown to a reasonable degree of medical certainty that the aggravation arose primarily out of and in the course and scope of employment.'" *Miller v. Lowe's Home Ctrs., Inc.*, 2015 TN Wrk. Comp. App. Bd. LEXIS 40, at *12 (Oct. 21, 2015), *citing* Tenn. Code Ann. § 50-6-102(14)(A) (2015). Mr. Adams can satisfy the burden of proving a compensable aggravation if: 1) there is expert medical proof that the work accident "contributed more than fifty percent (50%)" in causing the aggravation, and 2) the work accident was the cause of the aggravation "more likely than not considering all causes." *Id.* at *15, *citing* Tenn. Code Ann. § 50-6-102(14)(B)-(C) (2016).

Here, Dr. Grear stated an opinion that Mr. Adams' new injury is "causing increased instability into the Lisfranc complex, making his midfoot arthritis much more symptomatic and debilitating." (Ex. 2 at 20.) To the extent that the "new" injury might only be an aggravation, the Court finds Dr. Grear's opinion established that the event of August 2016 contributed more than 50% to Mr. Adams' need for medical treatment.

Though the result favors Mr. Adams, the Court disagrees with his argument that *Trosper* applies. The Appeals Board specifically rejected *Trosper's* logic because it was

7

decided under the now-abrogated liberal construction standard. *Miller*, at *12. Instead, the Court holds Dr. Grear's opinion that the event of August 3 contributes more than 50% to the need for medical treatment is controlling.

Given these findings, the Court determines Mr. Adams is likely to prevail at a hearing on the merits regarding his entitlement to medical benefits for his August 3, 2016 injury. Under the circumstances, particularly the acquiescence of Savage on two occasions, the Court holds Dr. Grear should be designated the authorized treating physician.

*Mr. Adams is entitled to the requested temporary total disability benefits*

The parties stipulated that Mr. Adams would be entitled to temporary total disability from September 6, 2016 to January 2, 2017, if the Court determined his injury is compensable. Having so found, the Court finds Mr. Adams is entitled to temporary total disability benefits for the stipulated dates, a period of sixteen weeks and six days, at the stipulated rate of $721.41 per week, for a total of $12,155.76.

**IT IS, THEREFORE, ORDERED** as follows:

1. Savage and Builders Mutual shall pay all medical bills related to the August 3, 2016 injury. Further, they shall authorize Dr. Grear to provide Mr. Adams reasonable and necessary treatment of his August 3, 2016 injury.

2. Savage and Builders Mutual shall pay to Mr. Adams temporary total disability benefits for the period of September 6, 2016, through January 2, 2017, sixteen weeks and six days, at the rate of $721.41, or $12,155.76.

3. This matter is set for a Scheduling (Status) Hearing on April 27, 2017, at 10:00 a.m. Central time. **You must call toll-free at 731-422-5263 or toll-free 855-543-5038 to participate in the Hearing.**

4. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3) (2016). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

5. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615)

8

253-1471.

**ENTERED this the 17th day of February, 2017**

_____
**Allen Phillips, Judge**
**Court of Workers' Compensation Claims**

## APPENDIX

Exhibits:

1. Deposition of Dr. John J. Lochemes
2. Medical Records of Campbell Clinic
3. First Report of Work Injury
4. Wage Statement
5. Employee's Choice of Physician (Form C-42)
6. Addendum to Petition for Benefit Determination
7. "Employer's First Interrogatories to Employee" with handwritten responses
8. Deposition of Byron Adams

Technical record:

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing
4. "Pre-Hearing Memorandum of Employee"
5. "Employer and Carrier's Response to Employee's Request for Expedited Hearing"

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 17th day of February, 2017.

| Name | Via Email | Service Sent To: |
|---|---|---|
| David E. Gordon, Esq., Attorney for Employee | X | davidg@davidgordonlaw.com |
| Catherine C. Dugan, Esq., Attorney for Employer | X | cate@petersonwhite.com |

**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**